# IN THE COURT OF APPEALS OF IOWA

No. 13-0759
Filed September 17, 2014

**CHRISTOPHER SKILES,**
Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
Respondent-Appellee.
_____

Appeal from the Iowa District Court for Scott County, Paul L. Macek, Judge.

An applicant seeks postconviction relief from his conviction for second-degree arson and conspiracy to commit a felony. **AFFIRMED.**

G. Brian Weiler, Davenport, for appellant.

Thomas J. Miller, Attorney General, Kevin Cmelik, Assistant Attorney General, and Michael J. Walton, County Attorney, for appellee.

Considered by Vogel, P.J., Bower, J., and Miller, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2013).

**MILLER, S.J.**

Christopher Skiles seeks postconviction relief from his convictions for second-degree arson and conspiracy to commit a felony. He claimed he received ineffective assistance because defense counsel (1) did not investigate the case, (2) did not impeach the testimony of some witnesses, and (3) should have objected to certain evidence. Skiles has not shown counsel breached an essential duty or that he was prejudiced by counsel's performance. We affirm the decision of the district court denying his application for postconviction relief.

## I.    Background Facts & Proceedings

On August 9, 2005, shortly before 4:00 in the morning, there was a fire at Links Gentlemen's Club in Davenport, Iowa. Images from a surveillance camera showed two men drove up in a white van. One of the men poured something from a gasoline can, and the other man started the fire. The men then drove away. For more than a year police officers were not able to identify either the van or the men.

Eventually, officers received an anonymous tip and connected the van in the video to Joshua Wright. When questioned, Wright admitted his participation in the incident and identified Christopher Skiles as the other man. At the time of the fire, Wright and Skiles were employed by Tuxedos Show Club. Wright stated he and Skiles had been working at Tuxedos during the day on August 8, 2005. After they got off work, early on August 9, 2005, they went to Walmart to buy a gasoline can, then went to Links, where they started the fire.

Officers showed still images from the video to Ronald Farkas, the owner of Tuxedos, and Stephen Houston, the manager of the club. Both Farkas and Houston identified Skiles as one of the men in the pictures. Houston also stated that in the early morning hours of August 9, 2005, he received a telephone call from Skiles who said, "'mother f***** burn,' or something like that." Cell phone records showed Skiles called Houston at 3:55 a.m. and again at 4:12 a.m.

Skiles was charged with arson in the second degree and conspiracy to commit a felony. A jury trial was held commencing on March 19, 2007. The jury found him guilty of both charges. Skiles was sentenced to ten years in prison. His direct appeal of his conviction was dismissed as frivolous. *See* Iowa R. of App. P. 6.1005.

On June 17, 2008, Skiles filed an application for postconviction relief, claiming he had received ineffective assistance of defense counsel. A hearing on his application was held on March 1, 2013. Skiles's former defense counsel and Skiles testified at the hearing. The district court denied Skiles's application for postconviction relief, finding he had not shown defense counsel breached an essential duty or that he was prejudiced by counsel's performance. Skiles appeals.

## II.    Standard of Review

We review claims of ineffective assistance of counsel de novo. *Ennenga v. State*, 812 N.W.2d 696, 701 (Iowa 2012). To establish a claim of ineffective assistance of counsel, an applicant must show (1) the attorney failed to perform an essential duty, and (2) prejudice resulted to the extent it denied the applicant

a fair trial. *State v. Carroll*, 767 N.W.2d 638, 641 (Iowa 2009). An applicant has the burden to show by a preponderance of the evidence counsel was ineffective. *See State v. McKettrick*, 480 N.W.2d 52, 55 (Iowa 1992).

### III. Ineffective Assistance

**A.** Skiles claims he received ineffective assistance because defense counsel did not investigate the case or interview potential defense witnesses. He provided defense counsel with a list of nine witnesses he believed would be helpful. Skiles also points out that Wright told officers he had discussed the fire with "several" people at work, and Skiles believes defense counsel should have tracked down these people and questioned them. Skiles asserts these witnesses could have provided evidence to show Farkas and Houston were biased against him. He asserts these witnesses could have provided evidence to impeach Wright's statement that the fire was motivated by dislike of Arabs. Skiles believes these witnesses also could have impeached Wright's testimony that Skiles was at work at Tuxedos that day. Furthermore, Skiles claims defense counsel should have attempted to obtain surveillance video from Walmart, which he contends would have disproven Wright's testimony that they went there to buy a gasoline can.

At the postconviction hearing, defense counsel recalled talking with Skiles about possible witnesses.[1] He stated, "I would have called any witnesses that I thought had relevant, admissible material which would have aided in Mr. Skiles's

---

[1] Defense counsel no longer had his trial court records, having given them to substitute counsel after the trial. Also, upon the request of the clerk of court, the trial court exhibits had been destroyed. The postconviction hearing was held in 2013 and defense counsel had little independent recollection of the trial, held in 2007.

defense." Defense counsel testified, "when we talked about the alibi witnesses, it's my recollection as I sit here today that none of the alibi witnesses Mr. Skiles provided were during the cogent time period of when the evidence otherwise showed the fire started." Defense counsel agreed he had not attempted to obtain surveillance video from Walmart.

"When complaining about the adequacy of an attorney's representation, it is not enough to simply claim that counsel should have done a better job." *Dunbar v. State*, 515 N.W.2d 12, 15 (Iowa 1994). "The applicant must state the specific ways in which counsel's performance was inadequate and identify how competent representation probably would have changed the outcome." *Id*. Here, Skiles speculates that there were witnesses who could have supported his contention Farkas and Houston were biased against him, would have testified he was not at work at Tuxedos on August 8, 2005, and would have testified he was not a racist. He also speculates there was Walmart surveillance video and it would have impeached Wright's testimony.

For the most part, it is largely unknown what witnesses Skiles believes would have supported his defense. For the witnesses he has identified, it is unknown what their testimony would have been. We also note it is unknown whether there even was a Walmart surveillance video, and if there was such a video, what it would have shown. Skiles has the burden to show by a preponderance of the evidence counsel was ineffective. *See McKettrick*, 480 N.W.2d at 55. We agree with the district court's conclusion Skiles did not meet

his burden of proof concerning potential witnesses and a possible Walmart surveillance video.

**B.** **1.** Skiles contends defense counsel should have attempted to impeach the trial testimony of Wright with evidence that he was not at work at Tuxedos on August 8, 2005. We first note Wright testified Skiles sometimes was around Tuxedos even when he was not working. Thus, even if employment records showed Skiles was not at work that day, it would not necessarily mean Skiles had not been at Tuxedos. In addition, whether or not Skiles was at work at Tuxedos during the day on August 8, 2005, does not answer the question of whether he and Wright went to Links and started a fire in the early morning hours of August 9, 2005. Wright's testimony on matters relevant to the time of the fire was corroborated by his interview with police officers, the video from the Links surveillance camera, and cell phone records. Thus, we do not believe there is a reasonable probability that impeachment of Wright on the issue of whether Skiles was working at Tuxedos on August 8, 2005, would have changed the result of the trial.

Skiles claims defense counsel should have challenged Wright's testimony by delving into his plea deal,[2] his falling out with Skiles, and Wright's criminal record. All of these matters were addressed during the prosecutor's direct examination of Wright during the criminal trial. Skiles has not shown how further examination of these issues during cross-examination would have probably

---

[2] Wright pled guilty to arson in the second degree and conspiracy to commit a felony. He had not yet been sentenced, and stated under the terms of the plea agreement the State would recommend probation. Wright stated he was not required to testify in any specific manner, but was to "testify truthfully at any proceeding requested."

changed the result of the trial. We also note defense counsel testified at the postconviction hearing, "I always try to be very sensitive regarding cross-examination of any witness in front of a jury. I think that jurors' perception of cross-examination is a critical part of evaluating how and what to cross-examine a witness on." We conclude that under the circumstances presented counsel's decision concerning the extent of cross-examination was a reasonable tactical decision.

**2.** Skiles claims defense counsel should have done more to undermine the credibility of Houston. He points out Houston did not do anything after receiving the telephone call from Skiles on the night of the fire and Houston and Farkas were sitting in the same room when they identified him from the photographs provided by officers. During cross-examination defense counsel did ask Houston about the telephone call on the night of the fire, and there was evidence that sometimes Skiles would call Houston while he was inebriated and "say a lot of stupid things." We also note defense counsel questioned Houston extensively on the size and shape of the room they were sitting in when he and Farkas identified Skiles from the photographs.

Skiles additionally claims defense counsel should have questioned Houston about Wright's statement to officers that Houston was aware of the fire, but Houston told Wright he would disavow all knowledge if questioned. Wright's statement about what Houston said to him would have been hearsay, and therefore, not admissible. *See* Iowa R. Evid. 5.802. Furthermore, even if defense counsel could have raised this issue, it does not change the fact

Houston testified he had known Skiles since they were children and he identified him from the photographs shown to him by officers. We conclude Skiles has not shown he received ineffective assistance of counsel on this issue.

**C.** **1.** Skiles contends he received ineffective assistance because defense counsel did not object to the testimony of Sam Graham, a billing configuration specialist with I-Wireless. He claims defense counsel should have required the State to provide a foundation to allow Graham to testify about the technology of cell phone towers, how they operate, and their range. Graham testified that he testified in court quite often and had testified throughout the state of Iowa. He testified the company's records showed "an identification number of the cell site that handled the call." He also stated, "On a cellular telephone network, when a customer makes or receives a call it's managed through a cell tower, which has distinctive cell site information on it, and that identification identifies which tower was used." Graham's testimony was used to show Skiles's general location when he called Houston at 3:55 a.m. on August 9, 2005.

Defense counsel testified at the postconviction hearing that Graham testified on "almost a weekly basis regarding cell phone towers and locations and the like." He stated he believed Graham "was the appropriate representative of the phone service to provide the testimony about towers in phones and interpretation of the bill." As the State notes, if defense counsel had objected, the State might well have been able to establish a foundation for Graham's testimony. Skiles has not shown the contrary, that Graham was not a qualified

and appropriate person to testify about cell phone towers and the records of Skiles's calls.

2. During the criminal trial, the Davenport fire marshall, Mike Hayman, was asked to review the video from the Links surveillance camera. The prosecutor asked him, "What did that appear to be, what you just saw there?" Hayman responded, "I would believe that to be Mr. Skiles with a gas can, pouring gas along the building." Skiles contends he received ineffective assistance because defense counsel did not object to this testimony by Hayman.

The district court found this testimony was cumulative to the testimony of Wright, who identified Skiles as the person who poured out gas at Links. In addition, the video showed a person pouring out gas at Links, and Farkas and Houston identified Skiles from still photographs obtained from the video. Skiles has not shown a reasonable probability the result of the trial would have been different if defense counsel had objected to the testimony of Hayman.

D. Skiles claims he was prejudiced by the actions of his defense counsel. He asserts defense counsel utterly failed to prepare a defense. In order to show prejudice, an applicant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ledezma v. State*, 626 N.W.2d 134, 143 (Iowa 2001) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). An applicant has the burden of proof to show there is a reasonable probability the jury would have come to a different verdict, if not for the actions of counsel. *Id.* at 144-45.

We have already discussed the prejudice component in relation to many of Skiles's claims. For all of the claims Skiles brings in his application for postconviction relief, we determine he has failed to show there is a reasonable probability the jury would have come to a different verdict if his defense counsel had acted differently. There was overwhelming evidence of Skiles's guilt based on the testimony of Wright, the video, the identification of Skiles by Farkas and Houston, and the cell phone records.

We affirm the decision of the district court denying Skiles's application for postconviction relief.

**AFFIRMED**.